[856 NYS2d 583]

LINDA P. NASH, Respondent, v PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Appellant.

In the Matter of WORLD TRADE CENTER BOMBING LITIGATION. STEERING COMMITTEE, Respondent, v PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Appellant.

First Department, April 29, 2008

## APPEARANCES OF COUNSEL

*Gibbons P.C.*, New York City (*John J. Gibbons* and *Jeffrey L. Nagel* of counsel), and *Milton H. Pachter*, New York City (*Carlene V. McIntyre* and *Arnold D. Kolikoff* of counsel), for appellant.

*Louis A. Mangone*, New York City, for Linda P. Nash, respondent.

*Sullivan Papain Block McGrath & Cannavo*, New York City (*Brian J. Shoot, Andrew J. Carboy* and *David J. Dean* of counsel); *Davis Wright Tremaine LLP*, New York City (*Victor A. Kovner, Sharon L. Schneier, Edward J. Davis* and *Peter Karanjia* of counsel); and *Fensterstock & Partners, LLP*, New York City (*Blair C. Fensterstock* of counsel), for Steering Committee, respondent.

### OPINION OF THE COURT

LIPPMAN, P.J.

On February 26, 1993, at midday, terrorists, utterly unimpeded, even by so much as a garage attendant or a gate, drove a bright yellow Ryder rental van, loaded with fertilizer-based explosive possessing the potency of 1,500 pounds of dynamite, into the subterranean public parking garage of the World Trade Center. They parked the van on the garage access ramp proximate to vital utility and communications systems and conduits, lit a 10-minute fuse and safely left the premises. The ensuing blast created a crater six stories in depth and wrought devastation over an area about half the size of a football field. Six people were killed, hundreds were injured and essential services to World Trade Center tenants were severed. Documentary evidence discovered from defendant Port Authority and introduced at the liability trial held in this consequent litigation brought to recover damages for personal and economic injuries allegedly attributable to defendant landlord's breach of its pro-

340

prietary duty to maintain its premises in reasonably safe condition established that, years before the bombing, defendant was in receipt of reports from outside consultants and its own internal study group advising it that the World Trade Center was vulnerable to terrorist attack through its public parking garage and detailing, with exact prescience, the manner by which the identified garage vulnerability could be exploited.

In 1984, then Port Authority executive director, Peter Goldmark,[1] recognizing what he described as the "iconic" nature of the World Trade Center and its consequent attractiveness as a target for terrorists, consulted Scotland Yard respecting the adequacy of security at the complex and reported back to his Port Authority colleagues that "[t]hey [Scotland Yard] are appalled to hear we had transient [public] parking directly underneath the Towers." In the same year, Port Authority police superintendent, Henry I. DeGeneste, issued a report titled "Terrorism Assessment World Trade Center 1984" in which the complex was described as a "prime" and "high risk" target for terrorists. DeGeneste deemed it "obvious that the potential for a terrorist attack upon the World Trade Center is a real possibility and [that] the results could be catastrophic," and specifically noted that "[t]he parking lots are accessible to the public and are highly susceptible to car bombings." In view of this preliminary assessment of the complex's vulnerability, Goldmark referred the matter to a specially constituted study group within the Port Authority, the Office of Special Planning (OSP),[2] for a comprehensive report and recommendations, and, practically contemporaneously, retained the services of an outside engineering consultant, Charles Schnabolk. In his report, issued in July 1985, Schnabolk expressed the view that it was not merely possible, but "probable," that there would be an attempt to bomb the World Trade Center and pointedly noted, "the WTC is highly vulnerable through the parking lot . . . With little effort terrorists could create havoc without being seriously deterred by the current security measures." Schnabolk recommended improving surveillance at the lot and screening entering vehicles for

1. Goldmark's tenure ended in July 1985.
2. The OSP was staffed, at various times, by between 10 and 15 full-time, highly qualified Port Authority employees with impressive experience in law enforcement and other security-related fields. During the nearly half year the study group worked on its report, it consulted extensively with anti-terrorism experts from various government agencies, including the Department of State, the Department of Transportation, the CIA, FBI and NSA, and with foreign experts in England, France, Italy and Switzerland.

explosives, and stated that it was "urgent" that the implementation of these recommendations proceed "immediately."

The Schnabolk report was followed, in November 1985, by the OSP report. After initially noting that the World Trade Center was "a most attractive terrorist target" "meet[ing] and surpass[ing] all the classical elements of the [terrorist] targeting process (e.g., symbolic value, accessibility, vulnerability, lack of recuperability and reduced risk to operatives)," the report addressed the risk posed by the complex's subgrade parking facilities: "Parking for 2,000 vehicles in the underground areas presents an *enormous opportunity*, at present, for terrorists to park an explosive filled vehicle that could affect vulnerable areas" (emphasis added). The report became still more specific in describing the feared scenario:

> "A time bomb-laden vehicle could be driven into the WTC and parked in the public parking area. The driver could then exit via elevator into the WTC and proceed with his business unnoticed. At a predetermined time, the bomb could be exploded in the basement. The amount of explosives used will determine the severity of damage to that area."

Leaving little doubt as to its view of the seriousness of the risk posed by the public parking garage, the OSP recommended that all public parking in the World Trade Center be eliminated.[3] In support of its recommendation, it observed:

> "Public parking in the WTC constitutes a *definite security risk* in that explosives may be readily concealed within a vehicle and parked within the core of the complex. The car bomb is fast becoming the weapon of choice for European terrorists and the fact that parking an explosives laden vehicle provides substantial escape time for the driver is ample justification to take decisive target hardening measures in this area" (emphasis added).

Realizing that the "decisive target hardening measures" it had recommended might not be palatable to the Port Authority's management, the OSP also proposed "compromise" measures,

---

3. While defendant emphasizes a portion of the OSP report referring to some "factor" as possessing "low risk," the extensive redactions made in the report, at defendant's insistence, make it impossible to determine what that "factor" is. In any case, the general tenor of the report as it bears on the risk presented by the public parking garage is unmistakable.

among them staffing the parking lot entrances and random vehicle searches.

All of the OSP's recommendations respecting the complex's subgrade public parking facilities were rejected by the Port Authority in December 1985, barely a month after they had been made, as entailing, inter alia, inconvenience and unacceptable revenue loss. However, yet another report on security at the complex was commissioned, and obtained by defendant in mid-1986. This report, generated by the outside consulting firm, Science Applications International Corporation (SAIC), did not, in its assessment of the risk posed by the World Trade Center's subgrade public parking, differ essentially from the earlier reports. It advised of the possibility of a car bomb, noted that vehicle access to the complex's subgrades was "uncontrolled," observed that the "uncontrolled" access ramps passed close to vital utility lines, and that well placed bombs on the access ramps "would likely damage at least half of the support services (fresh water, steam, cooling water, electrical and telephone) to the WTC users." The report's appendix set forth an "Attack Scenario" in which "[a] small delivery truck laden with several hundred pounds of explosive" parked on an access ramp and detonated after a short time-delay to permit the driver's escape would cause immense damage. Explosives in the "envisioned" quantities, the report noted, could be obtained by an "adversary" with "little difficulty." The SAIC report's recommendations respecting the identified public parking vulnerability, i.e., eliminating the subgrade public parking, instituting vehicle searches and installing barriers on the subgrade access ramps, met the same fate as the OSP recommendations.

In the years intervening between the above-described reports and the 1993 bombing, the subject of security in the World Trade Center's subgrade public parking garage appears to have lost currency with defendant's management,[4] even while, as the plaintiff's evidence showed, other high-profile buildings "hardened" their defenses against car bombs. The consultant's

---

4. While yet another report on security at the complex, referred to by the parties as the Burns and Roe Securacom Report, was delivered to defendant in 1991, and that report contained the assertion that a terrorist attack in the parking garage was "unlikely," the report did not purport to address the adequacy of the garage's security systems or the subject of car bombs. The report's author did, however, testify that he "surmised" a "potential" for a car bombing in the underground garage and that he had brought that potential to the attention of defendant during discussions. These discussions were not denied by defendant.

reports seem during this period, which notably coincided with the Gulf War, to have fallen into oblivion; so much so that neither defendant's director nor the World Trade Center's executive director at the time of the bombing learned of the reports until after the scenario described repeatedly in their pages had ripened from prognosis to reality.

Defendant, on this appeal from the trial court's order denying its motion to set aside the jury verdict finding that it was negligent in meeting its proprietary obligation to maintain the World Trade Center's underground parking garage in reasonably safe condition and that that negligence was a substantial factor in causing the February 1993 bombing,[5] does not argue that the bombing was unforeseeable as a matter of law. Indeed, the futility of the argument is manifest, not only by reason of its prior rejection by this Court in its affirmance of the denial of defendant's summary judgment motion (13 AD3d 66 [2004], *affg* 3 Misc 3d 440 [2004] *for reasons stated by Sklar, J.*), but in light of the above-recounted trial evidence showing that the exact scenario followed by the 1993 World Trade Center bombers had not merely been foreseeable, but had actually been foreseen and brought to the attention of the Port Authority management by its internal and retained security consultants years in advance of the event (*see Sanchez v State of New York*, 99 NY2d 247, 255 [2002]). Rather, defendant argues that, even if the garage bombing was foreseeable, it was under no legally enforceable obligation to take any of the recommended precautions against its occurrence. This general claim of nonliability is specifically premised upon defendant's contentions that, in making decisions respecting the security of its premises, it was acting in a governmental capacity and enjoyed consequent im-

---

**5.** The verdict sheet to which the jury responded asked whether defendant had been "negligent by not maintaining the World Trade Center's parking garage in a reasonably safe condition on February 26, 1993" and whether any such negligence was a substantial factor in "permitting" the bombing to occur. These interrogatories, when viewed, as they should be, in the context of the trial court's charge (*see Plunkett v Emergency Med. Serv. of N.Y. City*, 234 AD2d 162, 163 [1996]), which repeatedly and correctly instructed that a finding of liability could not be made unless the jury found both that defendant had been negligent and that its negligence was a substantial factor in causing the bombing, do not give rise to any legitimate question as to whether the jury made the requisite findings on the issues of negligence and causation. We have, in fact, approved a negligence interrogatory materially indistinguishable from the one here at issue, given in the context of a very similar negligence charge (*see Brewster v Prince Apts.*, 264 AD2d 611, 615-616 [1999], *lv denied* 94 NY2d 762 [2000]).

munity; that the likelihood of the bombing, as distinguished from its foreseeability, was not shown, and that in the absence of such a showing it was under no duty to heighten the subgrade public parking garage's security; and, relatedly, that, if defendant had any enforceable duty, it was merely to take "minimal precautions," which duty defendant claims must, on the basis of the trial evidence, be deemed to have been satisfied, as a matter of law.

On the prior appeal (13 AD3d 66 [2004]), we reviewed and rejected the first of these arguments, i.e., that defendant should be shielded from liability for negligence because its challenged acts and omissions arose from discretionary decisions taken in a governmental capacity. While we perceive no reason extensively to revisit the issue, we take the opportunity once again to register our agreement with Justice Sklar's meticulous analysis and consequent conclusion that the gravamen of this action is not that defendant failed properly to allocate government services to the public at large,[6] but that it failed in its capacity as a commercial landlord to meet its basic proprietary obligation to its commercial tenants and invitees reasonably to secure its premises, specifically its public parking garage, against foreseeable criminal intrusion (3 Misc 3d at 464-465; *see Miller v State of New York*, 62 NY2d 506 [1984]; *cf. Weiner v Metropolitan Transp. Auth.*, 55 NY2d 175 [1982]).

With respect to the second of defendant's above-enumerated arguments, it is, of course, true that courts have, in articulating the extent of a landlord's duty to afford those upon its premises protection from foreseeable third-party criminal conduct, employed the concept of likelihood to limit the reach of the landlord's obligation (*see Maheshwari v City of New York*, 2 NY3d 288, 294 [2004]; *Nallan v Helmsley-Spear, Inc.*, 50 NY2d 507, 519-520 [1980]), and that, in so doing, courts have measured the likelihood of third-party criminality by inquiring as to whether there were precedent crimes upon the premises that should have alerted the owner to the circumstance that it was in some measure probable that a crime such as that which befell the plaintiff would occur. The cases, however, do not hold that notice of a risk of third-party criminality must invariably be based on precedent incidents at the premises. Where there are other grounds to infer that the owner was or should have been

---

6. We note in this connection that the jury was specifically instructed: "You may not find the Port Authority liable for failing to allocate sufficient police resources with respect to the World Trade Center parking garage."

aware of a real risk that the alleged crime upon its property would occur, the law does not forbid an inference of notice and consequently arising duty (*see e.g. Jacqueline S. v City of New York*, 81 NY2d 288, 294-295 [1993]; *Moskal v Fleet Bank*, 269 AD2d 260 [2000]; *Rudel v National Jewelry Exch. Co.*, 213 AD2d 301 [1995]).

Without minimizing the obvious relevance of premises experience or history to the determination of whether an owner may be charged with notice of a dangerous condition on its property, it is nonetheless the case that the relevant requirement in premises liability actions is ultimately notice, not history. This is a case in point. Although at the time of the 1993 World Trade Center bombing there had been no remotely comparable precedent event at the complex, the trial record overwhelmingly permitted, indeed practically cried out for, the inference that defendant landlord had ample notice that a car bombing such as the one that occurred was not merely possible, but could very well occur if obvious, specifically identified vulnerabilities were not addressed.

There is no dispute that years in advance of the event defendant's top executives were aware that their "iconic" complex had become a high value target for terrorists. Nor is there question that defendant's management had been strongly advised, initially by Scotland Yard and subsequently by its own consultants, both internal and retained, that the public parking facilities situated directly beneath the Twin Towers constituted a particularly acute vulnerability, especially in light of the circumstance, of which defendant's management was also demonstrably aware, that car bombing had, even by the early 1980s, become a favorite terrorist modus operandi.[7] It will be recalled that the Schnabolk report, after warning that a car bombing at the complex was "probable" and that "[t]he WTC is highly vulnerable through the parking lot," recommended "urgent" steps, among them, improved surveillance and vehicle searches; and that the internally generated OSP report, having identified the complex's subgrade parking as a "definite security risk" and "an enormous opportunity . . . for terrorists,"

---

**7.** One Port Authority interoffice memo, authored by Edward J. O'Sullivan, the director of the OSP, in August 1985, read: "Attached is an article from the NEW YORK TIMES of August 15 regarding car bombs. As we mentioned at our meeting last week, car bombs are increasingly becoming the weapon of choice for terrorist groups. *All indications are that we will be confronted with these devices in this country before too long*" (emphasis added).

recommended the elimination of subgrade public parking as a "decisive target hardening measure[ ]." Neither these reports nor the ensuing SAIC report, with its essentially similar warnings and recommendations, may be rationally construed as benign advisories of a remote, merely hypothetical scenario of harm. The reports clearly warned that security at the World Trade Center's subgrade public parking garage was inadequate and that, if that "target" was not "hardened," defendant would be courting a real risk of an event of potentially catastrophic magnitude.

Defendant's insistence that notice be invariably conditioned on a premises-specific history, apart from being empirically insupportable on this record, would, if made a basis for law, result in a definition of duty bearing no sound relation to the nature of the risk. The risk identified in this case was of a distinctly higher order of magnitude than the risks typically at issue in premises security actions; it was not that of garden variety neighborhood criminality infiltrating premises of ordinary dimension, but of a terrorist attack directed, literally, at the underpinnings of a huge commercial hub. A risk of such extraordinary magnitude must, if it is to be dealt with prudently, be managed differently from the significantly less dire risks usually presented in premises liability cases. The obligation to avoid a potentially catastrophic event may not sensibly be made to depend upon a precedent catastrophe at the same premises. Indeed, it is fair to say that no reasonably prudent landlord, aware as defendant was of the value of his or her structure as a terrorist target and of a specifically identified condition upon the property rendering it vulnerable to terrorist penetration, would await a terrorist attack, particularly one directed at basic structural elements, before undertaking, to the extent reasonably possible, to minimize the risk. In such a context, the likelihood of the risk's eventuality, particularly as measured by a premises-specific history, should not be treated as a strict condition of duty; its importance in defining a landlord's obligation to safeguard his or her premises against criminal intrusion must, in any rational consideration of duty relative to risk, decrease as the seriousness of the injury to be anticipated should the risk materialize increases (see Miller v State of New York, 62 NY2d at 513). Where the seriousness of the injuries potentially arising from an identified risk is immense and the burden of the risk's minimization is relatively small (see id.), there can be no reasonable requirement that the risk's realization appear

more probable than not before a landlord's duty to address it is triggered; in such circumstances prudent risk management dictates that the risk be minimized if it presents as a real, as opposed to a purely hypothetical, possibility.

Plainly, the above-summarized documentary evidence permitted the inference that defendant was on notice that a devastating car bombing in the subgrade garage of its complex was a very real possibility. Tellingly, not one of the consultants who reviewed the security of the subgrade public parking facilities found that existing security measures were adequate or that defendant might, as an alternative to implementing the recommended precautions, prudently adopt a wait-and-see attitude.

Defendant's argument that, if it had any duty to take precautions against a car bombing in the World Trade Center's subgrade parking garage, that duty must, on the basis of the trial evidence, be deemed to have been satisfied, is without merit. The argument is premised upon the contention that, as defendant has put it, "the standard of care imposed upon a landlord is to take minimal precautions to protect tenants from crime." This is not the applicable standard, particularly given the nature of the risk presented.

The overarching proprietary duty of a landlord is to " 'act as a reasonable [person] in maintaining his [or her] property in reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk' " (*Basso v Miller*, 40 NY2d 233, 241 [1976], quoting *Smith v Arbaugh's Rest., Inc.*, 469 F2d 97, 100 [1972], *cert denied* 412 US 939 [1973]; *accord e.g. Peralta v Henriquez*, 100 NY2d 139, 144 [2003]; *Bethel v New York City Tr. Auth.*, 92 NY2d 348, 353 [1998]). This ultimate standard is as applicable in premises security cases as it is in other contexts where liability is sought as against a landowner for injuries allegedly attributable to premises hazards or defects (*see e.g. Miller v State of New York*, 62 NY2d at 513; *Nallan v Helmsley-Spear, Inc.*, 50 NY2d 507, 518-519 [1980]; *see also McDonald v M.J. Peterson Dev. Corp.*, 269 AD2d 734, 734 [2000]; *Madera v New York City Hous. Auth.*, 264 AD2d 579, 580 [1999]; *Luisa R. v City of New York*, 253 AD2d 196, 200 [1999]; *Kahane v Marriott Hotel Corp.*, 249 AD2d 164, 165 [1998]). Indeed, it has been observed that the duty of a landlord to take reasonable measures to minimize foreseeable danger on his or her premises from third-party criminal activity is "but a natural corollary to the landowner's common-law duty to make

the public areas of his property reasonably safe for those who might enter" (*Nallan*, 50 NY2d at 519). It is this standard, then, i.e., that of reasonable as opposed to minimal measures, that is recited in the presently applicable sections of both the New York Pattern Jury Instructions (PJI 2:90) and the Restatement of Torts (Restatement [Second] of Torts § 344), and that has been applied by juries in reaching premises security liability verdicts affirmed by this Court (*see e.g. Brewster v Prince Apts.*, 264 AD2d 611 [1999], *lv denied* 94 NY2d 762 [2000]).

It is true, of course, that a landlord is not an insurer of the safety of those upon his or her property and that the actual precautions sufficient to meet the reasonable care standard in premises security actions have often been described as "minimal." This is, in the vast majority of cases, a perfectly accurate description of the property owner's obligation; ordinarily, a landlord has discharged his or her duty if the basic perimeter and public area security systems, such as locks, buzzers, intercoms and lighting, are properly installed and maintained. The legally binding standard of care, as distinguished from the particular precautions required for its satisfaction in a given case, however, remains reasonable care to render the premises reasonably safe, and there are circumstances in which the nature and likelihood of a foreseeable security breach and its consequences will require heightened precautions, which, although still perhaps relatively minimal, are more burdensome than those of the sort previously mentioned (*see Nallan*, 50 NY2d at 518-520 [in light of the subject building's history of criminal incidents, a triable issue was raised as to whether the landlord's posting of one part-time lobby attendant was sufficient to meet its duty to "take *reasonable* precautionary measures to minimize the risk and make the premises safe for the visiting public" (*id.* at 520; emphasis added)]; *and see e.g. Moskal v Fleet Bank*, 269 AD2d at 260-261 [referring to the duty to provide "reasonable" and "adequate," as opposed to minimal, security in the area of defendant's safe deposit facilities]; *Four Aces Jewelry Corp. v Smith*, 257 AD2d 510 [1999] [triable issue as to whether the posting of only one security guard in a building housing a jewelry business was sufficient to satisfy landlord's security obligation]; *Garrett v Twin Parks Northeast Site 2 Houses*, 256 AD2d 224, 225 [1998, Rubin, J., concurring] [triable issue presented as to whether, in view of evidence of landlord's awareness of pervasive crime at the premises, landlord's "duty to take reasonable security precau-

tions beyond, and apart from, the mere maintenance of door locks and entry systems" was met]; *Rudel v National Jewelry Exch. Co.*, 213 AD2d 301 [1995] [triable issue as to whether there was a breach of the landlord's duty to provide security when, at the time of the robbery in the Diamond District building, there was only one unarmed security guard on the ground floor]).

What a landlord's duty reasonably to secure its premises against foreseeable criminal intrusion practically entails in a particular case will depend on the nature of the risk reasonably to be apprehended as well as the burden of the risk's minimization, fact-sensitive variables the quantification of which is ordinarily properly left for the jury (*Nallan*, 50 NY2d at 520 n 8; *Wayburn v Madison Land Ltd. Partnership*, 282 AD2d 301, 303-304 [2001]). Here, of course, the jury had before it evidence that the risk reasonably to be perceived by defendant was of an event potentially monstrous, both in dimension and character. And, in view of the extensive nature of the foreseeable harm, it would appear indisputable that the jury could have fairly concluded that defendant's discharge of its proprietary duty reasonably to minimize the risk of harm from criminality upon its premises entailed implementation of one or more of the above-described recommended precautionary measures. We would note in this connection that the jury heard and was entitled to credit the testimony of plaintiff's expert, Dennis Dalton, to the effect that it was, even in the mid-1980s and early 1990s, the industry practice either to eliminate or place strict controls upon public parking under or immediately adjacent to unusually large, high-profile buildings. Dalton testified that the Smithsonian Institution, Union Station in Washington D.C., the Bank of Boston, Fox Plaza in Los Angeles, and the Renaissance Tower in Dallas had accepted recommendations by him not to provide, or to eliminate, certain public parking, and that, although it had not been deemed practicable to do without public parking at the Prudential Center in Boston, other precautions, such as installing staffed gates and moving parking away from the building's infrastructure, had been instituted.

Plainly, the jury could have fairly concluded that the adoption by defendant of even the most decisive of the consultants' target-hardening recommendations would not, in light of the magnitude of the harm sought to be avoided and defendant's obvious ability handily to absorb the costs of the recommended precautions, have been unduly onerous. The jury, after all, heard

testimony that defendant's net income from the World Trade Center at the time in question was in the area of $100 million, and one of defendant's former executive directors testified that, notwithstanding the prominence of economic considerations among the contemporaneously documented reasons for defendant's rejection of the consultants' subgrade public parking recommendations, revenue loss from the elimination of subgrade public parking at the complex would have been "inconsequential." Nor was the jury obliged to find that adoption of the consultants' recommendations would have been prohibitively inconvenient. The recommendations would have affected only 400 of the 2,000 subgrade parking spots at the complex; the remaining 1,600 spots, assigned to tenants, would have been left intact,[8] and, of course, the complex was easily accessible to the public by modes of transport not dependent upon the availability of on-site parking.

Leaving aside the evidence permitting the jury to conclude that, under the circumstances, defendant's security obligation with respect to its subgrade parking facility had not been met, defendant's evidence purporting affirmatively to demonstrate the adequacy of existing security at the garage may well have seemed unimpressive. Although defendant represents that any duty it may have had was met, since the garage was patrolled by security personnel, surveilled by video cameras, and was occasionally the scene of random car stops and searches, the record more persuasively indicates that there was but a single officer assigned to patrol the 16-acre area covered by the World Trade Center's six subgrades; that "the major purpose" of the video cameras was to deter theft by lot attendants, not to deter other crime; and that there had, over a five-year period, been only seven days in which random searches had been conducted by defendant. Obviously, this evidence does not, as defendant contends, compel the conclusion that defendant's duty reasonably to secure its premises against foreseeable criminal intrusion was satisfied. Indeed, it would not compel the legal conclusion that defendant's duty had been met even if the applicable standard of care required only minimal precautions.

■ Turning now to the issue of causation, defendant does not contend that the evidence was insufficient to permit the jury to infer the requisite causal connection between the alleged

---

8. Indeed, the trial testimony disclosed that the total number of parking spaces would not have been changed by the elimination of public parking; the 400 public parking spots would simply have been transferred to tenants.

negligence and the bombing, or even that the jury's finding of proximate causation was against the weight of the evidence.[9] Rather, defendant argues that it should have been permitted to show in rebuttal that, even if the recommended precautions had been taken, the terrorists would have been undeterred from causing an explosion of similar character and extent, although perhaps at a different date, time and location, and that the court should have instructed the jury as to the viability of this theory instead of charging, as it did, that "[t]he Port Authority would not be liable if the same exact explosion would have occurred even with the various measures that the plaintiffs say should have been implemented."

To be clear, it is not defendant's position that it was prepared to prove that the World Trade Center bombing of February 26, 1993 would have occurred even if it had taken the precautions urged by plaintiff. Indeed, there is no indication that defendant possessed any evidence that the bombers, as they approached the World Trade Center on the morning of the attack, were prepared to do anything other than what they did and evidently planned after reconnoitering their target, namely, to drive into the subgrade public parking garage, park on the access ramp, set a fuse and leave—all without meeting a scintilla of resistance. Instead, defendant sought to prove that the recommended garage precautions would not have prevented the bombers from carrying out another "similar" attack.[10] But, even if this had been shown, and it was not by the evidence adduced, showing no more than that the bombers executed with relative ease a plan specifically premised upon the absence of any impediment to their penetration of their target, it would not suffice to demonstrate the absence of a causal nexus between the defendant's failure to adopt its consultants' recommendations respecting the underground garage and the explosion that occurred there.[11]

---

**9.** The futility of such a line of argument must have been obvious since defendant's own witness, OSP director Edward O'Sullivan, essentially conceded that implementation of the OSP's recommendations to heighten security at the public parking garage would have deterred the bombers, who he agreed were not suicidal, from committing the February 26, 1993 bombing.

**10.** Defendant actually urges that it "should have been able to argue, and the jury should have been permitted to consider, a range of alternative terrorist bombing scenarios—similar in 'character and extent' as the actual bombing" "without regard to the 'exact' same date, 'exact' same time and 'exact' same location."

**11.** In view of the basic invalidity of the theory upon which defendant's rebuttal is premised, it is not necessary to reach defendant's arguments urg-

We would have thought it clear that a plaintiff may not be deprived of a remedy for negligence by proof of the possibility of a nominally similar, although necessarily different, tortious occasion in which, in distinction to the matter sued upon, the alleged negligence is shown not to have been causally connected to the harmful event. It will nearly always be possible to hypothesize the circumvention of security precautions, particularly those of the sort so frequently described as "minimal," but the fact remains that such precautions must be supposed to provide some margin of security or the landlord's duty would be routinely excused as futile and thus rendered nugatory. That there may be another scenario under which similar harm might be caused notwithstanding the performance of the landlord's duty cannot defeat a plaintiff's showing that the margin of security that he or she would have been afforded had the landlord's duty been met would have been sufficient under the circumstances actually obtaining to deter the injurious conduct. Indeed, research discloses no case in which a plaintiff's proof of causation has been rebutted by a defendant's hypothecation of a merely "similar" tortious event in which the intentional tortfeasor would have and could have done what he or she demonstrably did not and was not prepared to do on the occasion of the actual wrong (*cf. Cerda v 2962 Decatur Ave. Owners Corp.*, 306 AD2d 169 [2003] [no causation where there was proof that a working front door lock would not have prevented the assailants from gaining access to the victim's building and committing the murder for which recovery was sought]; *Tarter v Schildkraut*, 151 AD2d 414, 416 [1989], *lv denied* 74 NY2d 616 [1989] [no causation where the jury could not have properly inferred "that reasonable security measures would have deterred the act of violence which was committed here"]). Nor, contrary to defendant's argument, does Comment *a* to Restatement (Second) of Torts § 432 contemplate such rebuttal. That comment provides simply, and unremarkably, that "[i]f, without the actor's negligent conduct, *the other* would have sustained harm, the same in character and extent as that which he receives, the actor's conduct . . . is not a substantial factor in bringing it about" (emphasis supplied). Obviously, "the other" refers not to some hypothetical party, injured at a different time and place, but to the actual plaintiff.

---

ing that expert testimony offered by it in support of this theory was improperly excluded. In any case, to the extent that such testimony was excluded, the exclusion was proper since defendant essentially proposed to use the experts as conduits for unreliable and inadmissible hearsay.

■ We come, finally, to the issue of apportionment. The jury, after hearing all the evidence presented at the lengthy trial of this matter, as noted, found that defendant had been negligent in failing to maintain its parking garage in reasonably safe condition and that this negligence was a substantial cause of the bombing. The negligence and the circumstances under which it occurred and contributed to the bombing, in the jury's view, justified assigning 68% of the fault to defendant.

Initially, there is no merit to defendant's contention that it is, as a matter of law, entitled to the protection of CPLR 1601. Inasmuch as the release from joint and several liability for noneconomic harm provided by that statute is available only to defendants 50% or less at fault, and defendant has been assigned a share of fault exceeding that ceiling, defendant's only conceivable argument that it is entitled, as a matter of law, to the statutory dispensation is that the jury was powerless to assign it, as a merely negligent tortfeasor, a percentage of fault higher than that of the parties whose intentional conduct concurrently caused the bombing. While it is true, as defendant points out, that intentional tortfeasors under CPLR article 16 are treated differently from negligent tortfeasors, and that intentional tortfeasors, unlike their merely negligent counterparts, are categorically excluded from benefitting from CPLR 1601 (see CPLR 1602 [5]; *Chianese v Meier*, 98 NY2d 270 [2002]), it does not follow that negligent tortfeasors are automatically entitled to a release from joint and several liability whenever an intentional tortfeasor is also responsible for the harm sued upon. Nowhere in the statute is such a dispensation expressed. Rather, under the statute, a defendant's qualification for the benefit conferred by CPLR 1601 is made to depend solely upon the jury's apportionment of fault, a determination that is necessarily fact-bound and should be guided not simply by the broad characterization of a defendant's conduct as being either intentional or negligent but also by the jury's exercise of its unique capacity to arrive at a more nuanced understanding of the nature and quality of the culpable conduct and its role in causing the plaintiff's harm.

It is, of course, possible that a jury's apportionment will be against the weight of the evidence, but a jury's failure properly to evaluate the evidence is not demonstrated simply by its determination to assign less fault to an intentional tortfeasor than it has assigned to a joint tortfeasor answerable only for negligence. Indeed, in *Cabrera v Hirth* (8 AD3d 196, 197 [2004],

*lv dismissed* 4 NY3d 794 [2005]), this Court expressly approved a 50-50 apportionment as between negligent and intentional tortfeasors, noting that "negligence and apportionment of liability are generally matters for the factfinder's determination, and a jury's apportionment of fault should not be disturbed where, as here, it is based on a fair interpretation of the evidence." And, while it is true, as defendant points out, that this Court and the Second Department have vacated apportionments pursuant to which intentional tortfeasors were assessed a lower share of fault than their negligent counterparts (*see Roseboro v New York City Tr. Auth.*, 10 AD3d 524 [2004]; *Stevens v New York City Tr. Auth.*, 19 AD3d 583 [2005]), these decisions were explicitly based "on the facts" and, accordingly, grounded in each court's assessment of the particular conduct and circumstances leading to the plaintiff's harm, rather than any absolute entitlement on the part of the merely negligent defendant to come within the protective ambit of CPLR 1601. Neither the magnitude of a defendant's negligence, nor its moral blameworthiness, nor the closeness of its causal relation to a plaintiff's harm necessarily diminishes to subordinate significance in the attribution of fault by reason of the circumstance that the harm was concurrently attributable to intentional conduct, even when the intentional conduct is particularly heinous. To the contrary, as this case so vividly illustrates, the blameworthiness of negligence may actually be increased by the heinousness of the wrongdoing it directly and foreseeably facilitates.

In *Roseboro* (10 AD3d 524 [2004]), the Transit Authority was found answerable in negligence for the conduct of a token booth clerk who fell asleep at his post early one morning and consequently failed to summon assistance for a subway patron undergoing a vicious assault; and in *Stevens* (19 AD3d 583 [2005]), the same defendant was found liable, also on a negligence theory, for the conduct of one of its subway motormen, who exceeded the safe station entry speed by approximately 10 miles per hour and, as a result, was unable to stop the train in time to avoid hitting a patron intentionally pushed into the train's path. Both cases, of course, involved heinous intentional wrongdoing, and that circumstance, certainly present here as well, undoubtedly figured prominently in the court's weight of the evidence calculus, as it should here. But the appellate weighing of the evidence in *Roseboro* and *Stevens* must also have taken into account that the negligence at issue in each case, although tragic in its outcome, was quite ordinary, amount-

ing to no more than a temporary inadvertent lapse by a relatively low-level employee, and was not reflective of any management policy or decision to leave the risk unaddressed. Indeed, the Transit Authority had in both cases taken reasonable precautions to minimize the complained-of risks; its liability was instead vicariously premised on its employees' inattentiveness, conduct that itself was not highly blameworthy on a moral scale, and particularly not with respect to the defendant employer, which, under the circumstances presented, realistically had little opportunity to prevent its token booth clerk from nodding off or its motorman from momentarily exceeding the prudent station entry speed. It is also relevant to understanding the Appellate Division decisions in *Roseboro* and *Stevens* that the connection between the negligence and the harm was, without the intervening intentional wrongdoing, highly attenuated. The intentional acts could not have been said in any sense to have been contingent upon or driven by the negligence; they did not flow from but merely joined the negligence, transmuting it from modest misfeasance into a cause of significant harm. It could not be clearer that the evidence placed before the jury in this case, fairly weighed, justified a very different resolution of these same highly pertinent issues and a commensurately different outcome as to the extent of defendant's equitable share of fault and its entitlement to limit its liability under CPLR 1601.

The evidence placed before the jury entitled it to conclude that defendant's negligence was, if not gross,[12] dramatically out of the ordinary. The documentary proof persuasively demonstrated that defendant, years in advance of the bombing, had been repeatedly placed on notice of a gaping vulnerability in its subgrade parking facilities rendering its premises susceptible to a potentially catastrophic car bombing; indeed, defendant was repeatedly advised, not simply as to the vulnerability, but as to the precise manner in which it could with little practical difficulty be exploited to devastating effect. The documentary evidence also demonstrated, indisputably, that defendant, at its highest levels of management, and after consideration of the reports and recommendations of its consultants, including most notably those of its own internal study group, on several occasions deliberately rejected every remedial measure recommended. Nor is it disputable that prominent among the

---

12. The jury was unable to reach a verdict on plaintiff's cause alleging that defendant acted with reckless disregard.

contemporaneously documented reasons for defendant's refusal to adopt the recommendations pressed upon it was its unwillingness to forgo public parking revenues.

The spectacle fairly raised by this evidence was one of a public authority that, while reaping tremendous income from its creation and operation of a huge commercial complex concentrating many thousands of people within its precincts, had, for reasons at best transparently insubstantial but clearly susceptible of far less sympathetic interpretation, rejected demonstrably practicable and efficacious risk-minimizing measures, and, in so doing, had elected to abide, for nearly a decade, a repeatedly identified extreme and potentially catastrophic vulnerability that would have been open and obvious to any terrorist who cared to investigate and exploit it. Here, the negligence itself, encompassing both neglect and deliberate decisions by defendant's top management, could hardly have appeared to the jury except as utterly surpassing. Certainly, next to it, the negligence of the token booth clerk in *Roseboro* or the motorman in *Stevens*, let alone that of their employer, must seem Lilliputian in scale. It is, however, not simply the magnitude of the negligence evidenced at the trial of this matter that justifies the jury's verdict, denying defendant the shelter of CPLR 1601, but the clear connection shown between that negligence and the intentional wrongdoing.

Here, in contrast to *Roseboro* and *Stevens*, the intentional wrong was not simply concurrent with the negligence, but to an unseemly degree flowed from the negligence and was determined by it, down to the details of its commission. As noted, the absence of any control upon access to the World Trade Center's subgrade public parking garage was not concealed; the garage's free accessibility was open and obvious to anyone who cared to drive in and have a look, and it was undisputed that that is precisely what the bombers did. No great perspicacity was necessary to discern, as defendant's own OSP had some eight years in advance of the event, that the garage represented an "enormous opportunity" for a car bomber. The event following from the exploitation of that "enormous opportunity," by means not merely foreseeable but specifically foreseen, was credibly, indeed nearly inevitably, understood by the jury as a direct consequence of defendant's negligence.

This was not a case in which ordinary negligence was transformed into a precipitant of tragedy by an otherwise unrelated, merely coincidental intentional act, but one in which the

intentional act was foreseeably responsive to and exploitative of the negligence and, causally, did little more than bring the incipient catastrophic potential of the negligence to terrible fruition.

In seeking to avoid this entirely justifiable construction of the evidence, defendant sought to portray the bombers as exceedingly determined and clever malefactors, whose success was attributable, not in the main to its negligence, but to their own "finely tuned" plan. It would, however, have been very difficult to convince any jury that a "finely tuned" plan was necessary to do what the bombers did. There was evidence before the jury that explosives in "envisioned quantities" were readily available and that, once the explosives had been obtained and loaded onto the rented van, all that remained between the bombers and their nefarious objective were tasks rendered horrifyingly and embarrassingly simple by defendant's negligence: driving the van into the complex's subgrade parking facility, parking on the access ramp, setting a fuse and leaving the scene—all with evident ease. Only the most rudimentary plan was needed to take advantage of the "enormous opportunity" that defendant had through its negligence provided.

There was, moreover, proof that could well have caused the jury to doubt the bombers' very capacity for "finely tuned" planning. The jury, after all, heard evidence that several of the bombers were apprehended after one of their number, shortly after the bombing, returned to the truck rental agency to claim the refund of his rental security deposit, conduct described by one of defendant's witnesses as "stupid." And, there was evidence showing that, a full day before the bombing, the bombers had reported the van stolen. It cannot have been taken as a sign of great shrewdness and planning acumen that the bombers had themselves afforded the police a predicate to stop their explosives-laden vehicle as they drove to the World Trade Center on the morning of the bombing.

Were the dispositive consideration in passing upon the jury's allocation of responsibility simply one of comparative reprehensibility, we would not hesitate to vacate the allocation as against the weight of the evidence; there is no question that the bombers' conduct was utterly wanton and that defendant's negligence, albeit great and facilitative of enormous harm, was not deserving of equal odium. The jury, however, in assigning fault, was required to consider more than the moral quality of the respective tortfeasors' conduct; its determination was also neces-

sarily, and even more essentially, premised upon the extent to which each tortfeasor contributed to the harm, and the evidence, fairly considered, clearly supported the view that defendant's negligence had been extraordinarily conducive of the terrorists' conduct—so much so that the fulfilment of the terrorists' plot and the ensuing harm could with clear justification have been understood as primarily attributable to that negligence. This being the case, we see no basis to disturb the jury's apportionment effectively denying defendant the protection of CPLR 1601.

The precise share of defendant's fault above the 50% ceiling established by CPLR 1601 is, in the present context, of no practical significance. What is dispositionally significant and, it would seem to us, beyond serious dispute, is that the evidence duly credited by the jury forcefully supports the conclusion that defendant is not the sort of "low-fault" defendant that the Legislature intended to benefit when it, in derogation of the common-law rule of joint and several liability, enacted CPLR 1601. The extreme nature of defendant's negligence, effectively subjecting the public over the course of nearly a decade to a specifically and repeatedly foreseen real risk of catastrophic harm, operated to exclude it from the statute's protective ambit.

The verdict we now uphold is neither properly nor intelligently understood as absolving the terrorists. The issue before the jury in this civil action was not whether the terrorists had committed the bombing—obviously they had—or whether they should be severely penalized—most of them were—but whether their heinous conduct was foreseeable and avoidable by defendant in the discharge of its proprietary responsibilities. Terrorism has for decades posed a dire threat to ordered life in free and open societies, but certainly its specter cannot justify the view that performance of the duties we have traditionally relied upon as essential to the preservation of our security may be generally excused as futile. It is, of course, entirely possible that terrorists will employ means that not even the conscientious performance of duty would deter and, where that is established, the absence of a causal nexus between the harm and any default by a defendant in the performance of its duty will preclude the imposition of civil liability. But, as this jury recognized, this was not such a case. Here, the evidence overwhelmingly supported the view that the conscientious performance of defendant's duty reasonably to secure its premises would have prevented the

harm. This civil jury had no power to decide whether the terrorists should in any meaningful sense be "absolved" of their murderous acts. What it could and did decide was rather that the acts of these terrorists, even while obviously odious in the extreme, were not a cause for the easy absolution of this defendant from its civil obligations.

Accordingly, the order of the Supreme Court, New York County (Nicholas Figueroa, J.), entered on or about March 2, 2007, which denied defendant's motion to set aside the jury verdict or, alternatively, for a new trial, should be affirmed, without costs.

MAZZARELLI, GONZALEZ, SWEENY and ACOSTA, JJ., concur.

Order, Supreme Court, New York County entered on or about March 2, 2007, affirmed, without costs.